# Brent *v.* Miller & Co.

*Action between Bankers for balance due on General Account.*

1. *Blank power of attorney not used ; rights of parties not affected thereby.*—On a sale and shipment of a cargo of lumber, from Pensacola to a foreign market, negotiated through the seller's foreign agent, payment to be made by approved acceptance of seller's (or his agent's) draft, on presentation of invoice and bill of cargo ; the seller's indorsed draft on his agent, payable to himself, with bill of lading attached as security for its acceptance, having been sold by a banker in Pensacola to a banker in Mobile, accompanied with a blank power of attorney signed by the seller of the cargo, which authorized the sale of the cargo, if deemed necessary or advisable for the payment of the draft ; the respective rights and liabilities of the two bankers, as between themselves, respecting the proceeds of sale of the cargo, are not affected by the power of attorney, when it appears that no sale was ever made under it.

2. *Agent contracting in his own name for undisclosed principal, personally liable.*—The Mobile banker having transferred the draft to his London bank correspondent, by whom the proceeds of sale of the cargo were afterwards received, and surplus (after payment of draft) entered to credit of drawer, the liability of the former to the Pensacola banker, for the surplus proceeds, is not affected by the fact that, in making the purchase, he acted as the agent of his London correspondent, whose name was not disclosed in the transaction ; the general principle applying, that when an agent contracts in his own name, not disclosing the fact that he is acting for another, he incurs a personal and primary liability.

3. *A sale and delivery of draft, with bill of lading attached as security for acceptance, is a pledge of cargo for that purpose.*—The delivery of a bill of lading is a constructive delivery of the cargo which it represents ; and when a bill of exchange is drawn against a shipment of lumber, a sale and delivery of the draft, with bill of lading attached as security for its acceptance, constitutes a pledge of the goods for that specific purpose ; and as to the surplus proceeds, after payment of the draft, the pledgee is liable as a trustee to the pledgor.


APPEAL from the Circuit Court of Mobile.

Tried before the Hon. W. E. CLARKE.

This was an action by the appellees, T. P. Miller & Co., bankers in the city of Mobile, against the appellant, F. C. Brent, a banker in Pensacola, Florida, for the recovery of

$691.35, balance due on general account. The material facts are stated in the opinion.

Among other pleas, the defendant filed the following :

"4. That on the 31st May, 1882, L. M. Merritt & Son, of Pensacola, Florida, drew their certain bill of exchange on S. Vaughn & Co., of Liverpool, England, for £1,500, payable to their own order, and in consideration of £1,500, paid to them by defendant, indorsed and sold the same to defendant, attaching thereto, as collateral security, bill of lading of the cargo of the ship or vessel called the "Wyoming," said cargo being of the value of £1,750. That defendant, in consideration of £1,500 paid him by the plaintiffs, indorsed and sold the said bill of exchange, the said bill of lading being attached, to the plaintiffs ; that the plaintiffs sold and delivered the same to Morton, Bliss & Co., of New York ; that S. Vaughn & Co. failed or refused to accept or pay the said bill of exchange, and that thereafter the said Morton, Bliss & Co., by themselves or by their agents, Morton, Rose & Co., of London, England, sold the said cargo under said bill of lading for the sum of £1,750, but that the plaintiffs have not paid to the defendant the said difference between the said bill of exchange and the said proceeds of the sale of said collateral security, to-wit, £250, although often requested so to do. And the defendant is willing to set-off the said sum, or so much as may be necessary, against the claim of plaintiffs."

"5. That on the 31st May, 1882, Messrs. L. M. Merritt & Son drew a certain bill of exchange, payable to their order, for £1,500, on S. Vaughn & Co., of Liverpool, England, and indorsed and sold the same to defendant for £1,500, having attached thereto, as collateral security, bill of lading of the cargo of the ship or vessel " Wyoming," said cargo being of a value of £1,750 ; that thereafter defendant indorsed and sold to plaintiffs for £1,500, the said draft with the said bill of lading attached, and plaintiffs indorsed and sold the same to Morton, Bliss & Co., of New York city ; *that thereafter, to-wit, on or about the 7th day of June, 1882, the said L. M. Merritt & Son, in consideration of the sum of £250 paid them by defendant, assigned to defendant their interest in the said bill of lading and in the said cargo ;* that thereafter, S. Vaughn & Co., failing or refusing to accept or pay the aforesad bill of exchange, the said Morton, Bliss & Co., by themselves or by their agents, Morton, Rose & Co., of London, England, sold the said cargo represented by said bill of lading for the sum of £1,750, but that the plaintiffs have not, although often requested so to do, paid to the defendant the said sum of £250, the difference between the said bill of exchange and

[Brent v. Miller & Co.]

the said proceeds of the said cargo, which sum, or so much as may be necessary, defendant is willing to set-off against the claim of the plaintiffs."

The defendant, also, filed pleas, numbered 6 and 7, which are respectively identical with the pleas above set forth, numbered 4 and 5, with the exception, that said pleas 6 and 7 do not contain the allegations "that the plaintiffs sold and delivered the same" (the bill of exchange) "to Morton, Bliss & Co., and that thereafter, the said Morton, Bliss & Co., by themselves, or by their agents, Morton, Rose & Co., of London, England, sold said cargo under said bill of lading for the sum of £1,750," but, in lieu thereof, said pleas allege, "that *persons holding through plaintiffs* the said bill of exchange, with the said bill of lading attached, sold said cargo under said bill of lading and realized from said sale the sum of £1,750." The plaintiffs, after demurrer to the said pleas 4 and 5 had been overruled, filed the following replications to said pleas 4, 5, 6 and 7 :

"1. That L. M. Merritt & Son signed a blank power of attorney, and blank hypothecation accompanying said draft of £1,500, and the bill of lading attached, on the 31st day of May, 1882, whereby they authorized the holder of said bill of exchange, and said bill of lading attached thereto, whoever he might be, to sell the cargo of lumber, to pay said bill of exchange, and to apply the proceeds of said sale to the payment of the bill for 'whom it may concern.' And plaintiffs say that Morton, Rose & Co., of London, England, were the parties into whose hands, said bill of exchange, and said hypothecation and bill of lading and power came, and that such act of said L. M. Merritt & Son authorized said Morton, Rose & Co. to sell and dispose of said cargo, before they sold the interest in it to said defendant, Brent, and that said Brent delivered said papers and documents to these plaintiffs, to be transferred and turned over to Morton, Bliss & Co., of New York, and thus ratified and confirmed the act of said L. M. Merritt & Son; wherefore plaintiffs say, that they are not liable for, and can not be charged with, any difference between said £1,500 draft and the proceeds of said cargo."

"2. Plaintiffs further say, that they (said plaintiffs) were merely the agents of Morton, Bliss & Co., and the defendant knew that plaintiffs, as the agents of Morton, Bliss & Co., were dealing with him in these particular transactions as such agents, and plaintiffs claim that, as such agents, they are not liable for the acts of their principals, but that said principals and they only are liable to defendant for any sur-

[Brent v. Miller & Co.]

plus of the proceeds of the cargo of the "Wyoming" over said bill of exchange of £1,500."

"3. That on the 31st day of May, 1882, the very day on which said bill of exchange of £1,500 was drawn and dated, and the very day on which said bill of lading was drawn and dated, said L. M. Merritt & Son, the drawers of said bill of exchange, and the endorsers of said bill of lading of the vessel "Wyoming," made and executed a written power of attorney in words and figures as follows, to-wit:

"Pensacola, Fla., May 31, 1882. Messrs. ——— : Gentlemen—We have this day sold to ———, our bill on S. Vaughan & Co., dated May 31, 1882, for £1,500 sterling, against a shipment of wood goods per 'Wyoming,' for Arendal, as per bill of lading to 'order,' herewith, with the understanding that the bills of lading are lodged as collateral security for the acceptance, and, if in your discretion, you deem it advisable, for the payment of said bill, and you are authorized, in case you think necessary, to place the said wood goods at any time in the hands of your brokers for sale at your discretion, and to charge all expenses, including commissions for sale and guarantee, and to apply the proceeds in or towards payment of the bill for account of 'whom it may concern.' Yours, respectfully, L. M. Merritt & Son." And the plaintiffs say that said power of attorney, being signed in blank, gave the holder of the same, to-wit, Morton, Rose & Co., the holder and indorsee of said bill of exchange and the holder of said bill of lading and said power of attorney from said L. M. Merritt & Son, full power and authority to dispose of and sell said cargo ; and plaintiffs say that said defendant, F. C. Brent, turned over said exchange and said bill of lading and said power of attorney so signed in blank, to these plaintiffs, and that these plaintiffs, without endorsing, filling out, or changing the same, forwarded all the said documents to Morton, Bliss & Co. ; said documents were in like manner forwarded to Morton, Rose & Co., of London, England ; and plaintiffs allege that defendant thus constituted said Morton, Rose & Co., of London, England, his agent and the agent of L. M. Merritt & Son, to sell and dispose of said cargo, and that said Morton, Rose & Co., and not these plaintiffs, are responsible to defendant for any surplus arising therefrom over and above the £1,500 draft ; wherefore plaintiffs say that defendant can not set-off said excess of value of said cargo over said draft of £1,500 against plaintiffs' claim."

The defendant demurred to these replications and assigned the following grounds of demurrer to each replication separately :

1. "That the said replication does not set forth that the said bill of exchange for £1,500 had ever been presented for acceptance, or that acceptance thereof had been refused."

2. "The said replication tenders an immaterial issue."

3. "The said replication, admitting the truth of the allegations of said pleas, as therein pleaded, fails to show any legal excuse why the plaintiffs should not pay to the defendant the said surplus over £1,500 admitted to have been realized from the said sale."

4. "The said replication is vague and uncertain as to the issues therein tendered."

The court sustained this demurrer to the first replication as a replication to the said pleas four and five, and overruled it as to said replication as a replication to said pleas six and seven, and to the action of the court in overruling said demurrer, the defendant excepted.

The court overruled the demurrer as to replication two, and also as to replication three, and in each case the defendant excepted.

At the conclusion of the evidence the court, on the request in writing of plaintiffs, gave the following charge : "If the jury believe the evidence, they will find for the plaintiffs," and the defendant excepted.

CLARK & CLARK, for appellant.—1. From the testimony, it would seem, that the appellees either themselves became the purchasers of the draft, or if they purchased for a foreign principal, they did not disclose the name of the principal nor the fact at the time of purchase. In case of an agent purchasing for an undisclosed principal, the rule of law is, that the agent is personally liable as principal in the transaction.—Wharton on Agency, § 464. And particularly is this the case, where the agent contracts at home for a *foreign* principal.—Wharton on Agency, § 514 ; Story on Agency, §§ 266, 267 and 268. The general charge given by the court takes from the jury the opportunity to canvass the testimony relating to the questions of agency *vel non* or the disclosure thereof. 2. Miller (plaintiff) was the party who dealt with Brent (defendant), and who received at Brent's hands the pledge of the cargo and is liable to Brent for the return of the cargo or its value, unless the cargo shall be put in the hands of the drawee of the draft, who is but an agent of the drawers, Merritt & Son. In other words, this transaction amounts to a pledge of the cargo, with the understanding that the pledge of the cargo is to be returned to the agent of Merritt & Son on the other side of the water, and that, in such case, the agent will re-

imburse Brent the amount advanced by him and for which the cargo was pledged. When Brent transfers this paper to Miller, he simply puts Miller in his own shoes ; Brent becomes accountable to Merritt & Son for the cargo or its proceeds, and in return holds Miller accountable to him. Miller, if he desires to employ a subordinate agent or make a re-pledge of the property, has the right to select his own pledgee or his own agent, as the case may be. Brent can not control or direct him in it. All Brent can do, is to say to Miller, account to me for this cargo or its proceeds. This is not only the law, but the only safe rule upon which commerce can be transacted. 3. A pledge is complete by constructive delivery; symbolical delivery is sufficient. When Miller took the bill of lading, he took the cargo, and the rules of law applicable are exactly those which would have been applicable, if no bill of lading had passed and Miller had been put aboard ship under a contract of pledge. 5 Wait's A. & D., pp. 168, 169. 4. As to the law of pledges of chattels, counsel for appellant cited :—Wait's A. &. D., pp. 170 to 175, 178, 179, 183 ; *Dows v. The Bank*, 91 U. S. 618 ; Story on Bailments ; Jones on Pledges, §§ 241, 242, 244, 418–428 ; *Bank v. Lutlgen*, 29 Minn. 363 ; 7 Hill R. 479 ; Bouvier's Law Dictionary, title " Hypothecation ; *Lickbearer v. Mason*, 2d Term Rep. 163.

OVERALL & BESTOR, *contra.*—1. The cause, as it stood before the court and jury, turned upon the construction of the power of attorney in blank (set up as answer to appellant's pleas in replication, numbered three), or as it was called by the witnesses, the "hypothecation" attached. [The court construed this blank power of attorney executed by Merritt & Son, and ratified by Brent by his delivering it to Miller & Co. in this condition, as authorizing the holder, whoever he might be, to fill up the blanks in the power and to act under its authority. Morton, Rose & Co., if any one, and not Miller & Co., were responsible to Brent for the value of the cargo over and above the £1,500 draft. —Jones on Pledges, 163 ; 1 Wait's A. & D. 595 ; Brice's Ultra Vires, 141 and note; *Bridgeport Bank v. N. Y. R. R. Co.;* 30 Conn. 274 ; 2 Dan. Neg. Instruments, § 1744. The power of attorney being in blank, the holder, whoever he might be, was authorized to fill up the blanks with his own name, or not to fill them up at all, as he should see fit.—See authorieties *supra*, and *Herbert v. Hine*, 1 Ala. 18 ; *Boardman v. Gore & Williams*, 1 Stew. 517 ; *Smith v. Crooker*, 5 Mass. 538 ; *Berwick v. Huntress*, 53 Maine, 89.

The only point really before this court, is, whether or not

the blank power of attorney authorized the holder of the bill of exchange and bill of lading to dispose of the cargo. The lower court was of opinion that it did ; hence its rulings on the demurrers and its general charge.

CLOPTON, J.—The suit was instituted by appellees, who are bankers in the city of Mobile, to recover against appellant, who is a banker, doing business in Pensacola, Florida, a balance due on general account.  The defendant admitted the correctness of plaintiffs' demand, but set up in answer, by plea of set-off, that the plaintiffs were indebted to him in a sum exceeding their demand, on account of the proceeds of a cargo of timber, shipped from Pensacola by L. M. Merritt & Son to Withers Furst of Arendal, Norway. The contention arises on the following facts, and others hereinafter stated :

In October, 1881, Merritt & Son, by their agents, S. Vaughn & Co., of Liverpool, who acted by James Smith & Co., wood brokers, made a contract with Furst for the sale of specified kinds and quantities of pine timber at the stipulated and aggregate price of £1,750—the timber to be shipped from Pensacola, and payment to be made by approved acceptance of sellers' or their agent's draft, payable in London at four months from date of bill of lading on presenting the invoice and bill of the cargo.  On May 31, 1882, Merritt & Son drew against the shipment a draft on Vaughn & Co. for £1,500, payable to their own order and endorsed by them. The draft, with the bill of lading attached as security for its *acceptance* by Vaughn & Co., was sold by defendant to the plaintiffs, the defendant also guaranteeing its *acceptance*. A written instrument, signed by Merritt & Son, in blank as to the name of the person to whom addressed, and of the person to whom the draft was sold, was delivered to the plaintiffs with the draft and bill of lading.  The instrument recites the sale of the draft against the shipment of the timber as per bill of lading, with the understanding that the bill of lading is lodged as collateral security for its acceptance, and contains authority, if deemed advisable or necessary for the payment of the draft, to place the goods at any time in the hands of their brokers for sale, and to charge all expenses, including commissions, for sale and guarantee, and to apply the proceeds to the payment of the draft for account of "whom it may concern."  The plaintiffs sent the draft, with the bill of lading attached, and the accompanying blank instrument, without endorsement, or filling the blanks, or any alteration whatever, to Morton, Bliss & Co., of New York, who forwarded them to Morton, Rose

& Co., of London. On reception of the proceeds of the cargo, Morton, Rose & Co. appropriated the surplus, after payment of the draft and incidental expenses and commissions, to their general account against Merritt & Son. The contestation is, whether the plaintiffs, on the foregoing facts and others herein mentioned, are personally liable to account to the defendant for this surplus; or stating the question more accurately, whether the jury could have reasonably inferred from the evidence a state of facts, which charged a personal liability on the plaintiffs; the court having affirmatively charged the jury in their favor on the effect of the evidence?

The plaintiffs insist that Morton, Rose & Co., if any one, are exclusively responsible to the defendant for the surplus of the proceeds of the cargo; and that the only question really before the court is, whether or not the blank power of attorney authorized the holder of the draft and bill of lading to fill or not to fill the blanks as he should see fit, and to dispose of the cargo. In other words, that the blank power of attorney, accompanying the draft and bill of lading, constituted Morton, Rose & Co., the holders of the draft, agents of Merritt & Son, or of the defendant, and operated to release the plaintiffs from liability for the misappropriation of the surplus, if there was a misappropriation. We do not consider the blank power of attorney as having any material bearing, under the facts of the case, on the question of the personal liability of the plaintiffs, and, therefore, do not propose to consider its legal effect. If it be conceded that the holders of the draft were authorized to place the goods in the hands of their brokers for sale, whenever deemed advisable or necessary for its payment, and if it be further conceded, as to which we express no opinion, that the holders, in thus placing the goods for sale, act as the agents of Merritt & Son—before the plaintiffs can effectually assert any release or discharge thereby, the authority conferred must be exercised. Without such exercise the blank power of attorney can have no effect, either to confer rights or to release from liability, if a liability would otherwise exist. It constituted a security for the payment of the draft, additional to the security for its acceptance, created by attaching the bill of lading, and was intended to meet any circumstances or contingency that might arise, rendering a sale advisable or necessary for its payment —such as the failure or refusal of Vaughn & Co. to accept, or their intervening insolvency. Had Vaughn & Co. continued solvent, and accepted the draft, they would have been entitled to the bill of lading, and the cargo released

[Brent v. Miller & Co.]

from the pledge, so that they could deliver it to Furst and indemnify themselves against loss by reason of their acceptance of the draft. The authority is not to perform the original contract of sale between Merritt & Son and Furst. A sale, other, distinct, and for a different purpose, was contemplated and authorized. It is not shown that such sale was made. By some arrangement, not appearing, but presumably with Morton, Rose & Co., James Smith & Co. delivered the bill of lading and invoice to Furst, and received in payment his acceptance of their draft, payable in London at four months from the date of the invoice, as provided by the original contract of sale. The blank power of attorney did not itself, without an execution of the power, operate to create a relation between the parties, other and different from what would have been the legal effect of the transaction, in the absence of such power of attorney, whatever might have been its subsequent effect had the authority been exercised.

It is further contended that the plaintiffs purchased the draft as agents and on joint account of Morton, Bliss & Co. and Morton, Rose & Co. Such is the evidence of two of the plaintiffs, and one member of the firm of Morton, Bliss & Co.; and there being no contradiction, we will assume such to be the fact. A disputed question of fact is, whether the defendant knew that the plaintiffs were in the habit of purchasing exchange as the agents of the firms mentioned. As to this, the evidence is in conflict. The plaintiffs were engaged in purchasing exchange, both on their individual account, and on account of others. Though it may be true that the plaintiffs purchased the drafts as agents, there is evidence tending to show that the names of their principals were not disclosed. In fact, one of the plaintiffs testifies that no notice was given to the defendant that the draft was being purchased on account of Morton, Bliss & Co. and Morton, Rose & Co. If this be true, the case presented is that of a person really acting as agent, but ostensibly in his own name, on his own responsibility, and inviting credit to himself. "An agent, who contracts in his own name, without disclosing that he is acting for a principal, incurs a personal liability, which is primary in its character." And such agent is not relieved from liability on transactions, when his principal is undisclosed, and credit is given to him personally, because he generally acts as agent for disclosed principals in other transactions.—*Wood v. Brewer*, 73 Ala. 259 ; Whar. on Agency, §§ 490, 496, 497. There are sufficient reasons requiring a stringent application of the rule

in cases where one of the undisclosed principals resides in another State, and the other in a foreign country.

The delivery of a bill of lading is a constructive or symbolical delivery of the cargo, which it represents, to the same extent and for the same purposes, as if the goods were corporeally delivered. The sale, delivery, and purchase of the draft, with the bill of lading attached, as security for its acceptance, constituted a pledge of the goods for the acceptance of the draft, and created the relation of pledgor and pledgee between Merritt & Son and the plaintiffs, unless it is shown that Merritt & Son, through the defendant, dealt with the plaintiffs, as agents and on the credit of their principals. The plaintiffs acquired the rights of a pledgee of the property, and nothing more. Having a special property, they could sell or assign it without impairing the lien, subject to the rights of the pledgors, but could not alienate it absolutely, or beyond the title possessed, and the pledgors may transfer the property subject to the pledge. The principals being undisclosed, the plaintiffs became trustees as to the proceeds of the cargo in excess of the payment of the draft, and primarily liable to account to Merritt & Son. Jones on Pledges, §§ 242, 364; 5 Wait's Ac. & Def. 172, 174.

While the draft was in transit from New York to London, Morton, Bliss & Co. informed the plaintiffs of the failure of Vaughn & Co. Thereupon, the plaintiffs called defendant's attention to the rumored failure, and to the fact, that he had guaranteed the acceptance of the draft, but not its payment. The defendant afterwards procured from Merritt & Son a draft drawn directly on the purchaser, first, for £1,750, the full price of the cargo, for which amount he gave Merritt & Son credit in his account with them ; and thereby became the owner of, and entitled to the surplus of the proceeds of the cargo after payment of the draft for £1,500. The draft for £1,750 was delivered to the plaintiffs, June 8, 1882, by the defendant, with a guarantee of its acceptance, and a proposition to substitute it for the former draft, the account of the defendant to be credited with the additional £250. The plaintiffs acknowledged the receipt of the draft, and agreed to credit defendant's account as required, if Morton, Bliss & Co. would credit them. The draft was immediately forwarded to Morton, Bliss & Co. by mail. They were informed of the proposed substitution, and that defendant required the excess, when paid, to be held for his account. Morton, Bliss & Co. acknowledged, June 12, 1882, the receipt of the letter inclosing the draft, and replied : "We will forward for collection the bill of L. M. Merritt & Son to Withers Furst for £1,750, and will ask our London

friends to hold as security for it the documents of the bill on S. Vaughn & Co. for £1,500. We will credit Mr. Brent for the £250 excess of the bill endorsed by him, less interest charges on the latter bill and collection charges on the £1,750." If these facts be found by the jury, and there is evidence tending to establish them, after plaintiffs had notice, that defendant had acquired the rights of Merritt & Son, a new and substituted contract was made, founded on a sufficient consideration—the altered position of defendant, and the assumption of another and different liability—which became complete on the consent of Morton, Bliss & Co. to give the required credit. It is true the draft was never presented for acceptance, the excuse being, as testified by the witness, Cross, a member of the firm of Morton, Bliss & Co., that before the draft reached London the cargo had been delivered to Furst and paid for by him. Furst testifies, that he received the cargo in July, but that he had received the bill of lading previously, and paid for the cargo by the acceptance, June 29, 1882, of the draft of James Smith & Co., dated May 31, 1882, and payable at four months. The draft of Merritt & Son on Furst was retained by Morton, Bliss & Co., or the plaintiffs, until its delivery to the defendant during the progress of the trial.

So far as appears from the record, Morton, Rose & Co. never acquired from Merritt & Son, or the defendant, any right to the proceeds of the cargo, other than an appropriation of so much as was requisite to pay the draft for £1,500. Neither by the purchase of the first draft, nor by the subsequent agreement, did they acquire any authority to apply or dispose of the excess. Its application, in September, 1882, to their general account against Merritt & Son, arising from the deficiencies on other bills drawn by them, if not guaranteed by the defendant, was in violation of intervening rights, and unauthorized. The record contains no evidence tending to show any privity of contract, as to such excess, between Morton, Rose & Co. and the defendant. In making the agreement to credit the defendant with the additional £250, the plaintiffs did not profess to act for, or as the agents of Morton, Bliss & Co., or Morton, Rose & Co. They undertook in their own names and on their personal responsibility to credit the defendant with the excess, in *their* account, the only condition prescribed being that Morton, Bliss & Co. would credit them. As to such excess, after payment of the draft for £1,500, and proper charges, Morton, Rose & Co. were not agents of the defendant. As the defendant acquired title to such excess, and as the plaintiffs, by a valid contract, agreed to credit him with the ad-

ditional £250, thereby incurring a personal and primary liability, its subsequent misapplication by Morton, Rose & Co. does not defeat his right, nor operate to discharge the plaintiffs from such liability. Though Morton, Rose & Co. may be foreign principals as to the draft for £1,500, the defendant will not be remitted to recourse on them for the excess, in the absence of an agreement to look to them for a proper accounting.

The demurrer to the second replication was properly overruled. It alleges, that the plaintiffs acted as the agents of Morton, Bliss & Co., who were doing business in New York, and that the defendant knew that they were dealing with him in the particular transactions as such agents. On the principles of this opinion, the averments of the third replication are insufficient, and the demurrer thereto should have been sustained. On the undisputed facts and the conflicting evidence, the jury could have legally found a verdict in favor of the defendant. The court therefore erred in giving an affirmative charge in favor of the plaintiffs.

Reversed and remanded.